UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

KATHRYN GANDY, et al,                    *

     Plaintiffs,                              *

v.                                        *          Civil Action No. GLR-20-3436

HOWARD COUNTY BOARD OF                   *
EDUCATION, et al.,
                                          *
     Defendant.

                        ***

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Defendants Howard County Board of Education ("BOE") and Carol Hahn's (together, "BOE Defendants") Motion to Dismiss (ECF No. 25); Defendant Breona Whittaker's Motion to Dismiss Amended Complaint (ECF No. 26); and Defendant Amanda Peter's Motion to Dismiss Amended Complaint (ECF No. 29). The Motions are ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will grant in part and deny in part the Motions.

## I.      BACKGROUND[1]

Plaintiffs Kathryn Gandy ("Mrs. Gandy") and Christian Gandy ("Mr. Gandy") (together, the "Gandys") are the parents of Student Doe who, at the time of the incident at issue here, was a six-year-old child enrolled at Bellows Spring Elementary School

---

[1] Unless otherwise noted, the Court takes the following facts from the Amended Complaint and accepts them as true. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (citations omitted).

("Bellows Spring"). (Am. Compl. ¶¶ 1–2, 63, ECF No. 16). Student Doe has been diagnosed with intellectual and behavioral disabilities, including Autism Spectrum Disorder and Mixed Expressive Language Disorder. (Id. ¶ 13). These disorders render Student Doe non-verbal and behaviorally impaired. (Id.).

As a result of his intellectual and behavioral disabilities, Student Doe is eligible for special education services, including an Individualized Educational Program ("IEP") and Behavioral Intervention Plan ("BIP"), which were developed for him and implemented by the Howard County Public School System ("HCPSS"). (Id. ¶ 14). Student Doe's IEP was developed in April 2018, during the 2017–18 school year. (Id. ¶ 19). The IEP noted that Student Doe needed "close adult supervision" while at Bellows Spring. (Id. ¶ 20). Despite his significant disabilities, Student Doe's IEP noted that he demonstrated significant progress and success during the 2017–18 school year after enrolling in HCPSS's Primary Learner program. (Id. ¶ 22). The Primary Learner program is different from a regular curriculum in that it "is designed for students with education disabilities in kindergarten through second grade, that present with significant delays in functional communication, engagement and social interaction." (Id. ¶¶ 16–17).

At the start of the 2018–19 school year, Defendant Amanda Peter, a special education teacher, was assigned to Student Doe's class at Bellows Spring. (Id. ¶¶ 4, 15, 23). Student Doe's class comprised of five students who also suffered from significant disabilities; these students were assigned to a small "self-contained classroom" at Bellows Spring separated from the rest of the student population. (Id. ¶ 15). Peter was aided by at least three "para-educators," including Defendant Breona Whittaker. (Id.). Aside from

2

Peter and Whittaker, numerous other Bellows Spring personnel entered Student Doe's classroom throughout the day to supervise. (Id. ¶ 18).

On August 31, 2018, just before the 2018–19 school year started, the Gandys wrote to the principal of Bellows Spring stating their concern that Peter, whom they had met earlier that day, seemed unfamiliar with Student Doe's IEP and other basic information, such as whether Student Doe used a communication device. (Id. ¶ 47). The Gandys also expressed concern that most of the staff were new to the classroom. (Id. ¶ 48). Additionally, the Gandys expressed their lack of confidence that Student Doe's teacher understood his needs, possessed the ability to properly care for Student Doe, and could keep Student Doe safe. (Id. ¶ 49). According to the Gandys, because Student Doe and the other students were accustomed to the Primary Learner program, any deviation or inconsistency from this teaching style would confuse the students and, in turn, increase challenging behaviors among them and possibly threaten their safety. (Id. ¶ 50).

During the first few weeks of the 2018–19 school year, the Gandys corresponded with Bellows Spring staff on several occasions regarding their concern that Student Doe's teachers were not meeting his safety needs. (Id. ¶¶ 51–52). The Gandys explained that they knew something was wrong because Student Doe was coming home agitated every day. (Id.). Additionally, the Gandys told Bellows Spring staff that Student Doe had come home with an unexplained cut on his elbow. (Id. ¶ 52). On September 16, 2018, Mrs. Gandy sent an email to Terrell Savage, the special education director for HCPSS, pleading for Savage to intervene in what she described as a "dire situation" at Bellows Spring and a "crisis" in Student Doe's classroom. (Id. ¶ 53). In the email, Mrs. Gandy explained that she was called

on two occasions to pick Student Doe up early from school because he suffered injuries without explanation. (Id. ¶ 54). Mrs. Gandy also explained that Student Doe's BIP was not being implemented properly and that his teachers were "new, confused, and tentative," which threatened Student Doe's safety. (Id. ¶ 55). Due to their concerns about the treatment of their son, the Gandys scheduled their in-home board-certified behavioral analyst to observe Student Doe in his classroom on Tuesday, September 18, 2018, to provide guidance on how to keep Student Doe safe at Bellows Spring. (Id. ¶ 61). However, on Monday, September 17, 2018, Student Doe was injured at school. (See id. ¶¶ 62–87).

Video footage from September 17, 2018 shows that Student Doe was "smiling and happy" and "calmly walking" as he was escorted towards the self-contained classroom after getting off the bus that morning.[2] (Id. ¶ 64). Likewise, Student Doe's bus driver and the bus aide do not recall any difficulty or agitation with Student Doe on the bus that morning. (Id.). Video footage also shows Student Doe calmly walking in and out of his classroom throughout the day. (Id. ¶¶ 65–66). But at 2:55 p.m., shortly before the school day ended, the school nurse was called to Student Doe's classroom, where she found Student Doe crying and experiencing swelling on his forehead. (Id. ¶¶ 68–69). The school nurse left Student Doe's classroom at 3:10 p.m. (Id.¶ 71).

Video footage from around 3:16 p.m. shows that Student Doe was "lacking coordination," had "an unsteady gait and loss of balance," and had "trouble supporting

---

[2] The Gandys note in their Amended Complaint that they were provided video footage "of Student Doe's movements" from September 17, 2018; however, according to the Gandys, the videos appear to be "largely edited" because the time stamps show that "significant chunks of time are missing." (Am. Compl. ¶ 67).

himself without the aid of an adult or the wall" while he walked through the halls. (Id. ¶ 72). Around 3:39 p.m., video footage shows that Student Doe's head appeared to be swollen as he walked back to his classroom from the administrative area of the building, near the nurse's office. (Id.¶ 73). Around 3:46 p.m., Defendant Whittaker walked Student Doe to the bus. (Id. ¶ 74). Although Student Doe "could barely stand on his own" and had "obvious defects in his coordination and gait," Whittaker failed to assist him while walking. (Id.). While waiting for the bus, Student Doe could not support himself on his own and leaned on a windowsill to prevent himself from falling over; despite this, Whittaker turned her back to Student Doe. (Id. ¶ 76). Then, when the bus arrived, Whittaker "hurriedly drag[ged] Student Doe to the bus" and appeared to be "completely unconcerned about Student Doe's head injury, his inability to walk, and his general daze." (Id. ¶ 77).

Student Doe rode a bus with other disabled students. (Id. ¶ 79). The bus had both a driver and a bus aide. (Id. ¶ 80). While on the bus, Student Doe was strapped into a harness and placed away from the window to prevent him from striking his head on the seat in front of him or window next to him. (Id. ¶¶ 82, 84). Student Doe lived less than a mile from Bellows Spring, and his bus ride home took less than ten minutes. (Id. ¶¶ 78, 81). On the day of the incident, the bus aide walked up and down the aisle during the ride home and did not witness Student Doe hit his head on anything. (Id. ¶ 84). However, the bus aide recalled that Student Doe had a swollen forehead and seemed dazed, "zombied out," pale, and not himself on the bus ride. (Id. ¶ 83).

Upon arriving at the Gandys' home, the bus aide told Mrs. Gandy that Student Doe "was dazed and not himself." (Id. ¶ 85). A photograph that Mrs. Gandy took of Student

Doe when he got home shows that his forehead was red and swollen. (Id. ¶ 86). Mrs. Gandy then took Student Doe to Howard County General Hospital. (Id. ¶ 88). Student Doe vomited on the way to the hospital. (Id. ¶ 89). Student Doe was ultimately diagnosed with a concussion. (Id. ¶ 90). A photograph of Student Doe taken after he returned home from the hospital shows that his forehead was enlarged and swollen. (Id. ¶ 91). Two days after the incident, Student Doe's eyes were bruised and "mostly swollen shut due to the effect of gravity on the blood in his forehead flowing down into his eyes." (Id. ¶ 92). Four days later, during a follow-up visit with Student Doe's pediatrician, Student Doe "exhibited an abnormal level of agitation and resistance to examination." (Id. ¶ 93). Student Doe later suffered several seizures and was hospitalized at Johns Hopkins Hospital in Baltimore, Maryland. (Id. ¶ 94).

In addition to his physical injuries, Student Doe also suffered from emotional trauma after the September 17, 2018 incident. Student Doe cried every time he was driven by Bellows Spring; experienced "significant nightmares that woke him up during the night screaming and crying"; exhibited diminished appetite, sensitivity to light, headaches, and dizzy spells; and suffered from significant separation anxiety and increasingly erratic behavior. (Id. ¶ 95). The Gandys also experienced "significant emotional trauma" after the incident. (Id. ¶ 96). For example, Mrs. Gandy "often cried herself to sleep at night," and the Gandys "began to demonstrate hypervigilance regarding their children's safety," which caused them to miss time from work to stay with Student Doe and to spend "significant sums of money to make arrangements for their son's care." (Id. ¶¶ 96, 99–100). The Gandys also transferred Student Doe to a non-public school and enrolled him in behavioral therapy

to treat the psychological, emotional, and mental distress resulting from his injury. (Id. ¶ 126).

Because Student Doe is non-verbal, he cannot state what happened to him on September 17, 2018. (Id. ¶ 111). The Gandys posit four possibilities for what happened to Student Doe: (1) "Student Doe was struck by one or more of the Individual Defendants either intentionally or negligently"; (2) "Student Doe harmed himself by striking his head with his body or on some object"; (3) "Student Doe fell and struck his head"; or (4) "Student Doe was struck by another student." (Id.).

According to the Gandys, "Student Doe's pediatrician concluded that the lack of an abrasion to Student Doe's forehead indicated that his forehead made contact with a smooth firm surface." (Id. ¶ 102). The pediatrician "later concluded that the damage could not be caused by self-injury (e.g. head banging)." (Id.). The Gandys also assert that Student Doe's physicians and instructors had not previously observed Student Doe engaging in any self-injurious behavior. (Id. ¶¶ 105, 108–09). Furthermore, "Student Doe had no defensive wounds indicating self-injury, a fall, or an assault from another student." (Id. ¶ 103). Separately, although Student Doe could have been injured while Peter and Whittaker attempted to restrain him, Student Doe's IEP and BIP did not call for restraint and there is no restraint report documenting his injuries as required by state law and school policy. (Id. ¶¶ 114, 116). The Gandys thus assert that "[t]he lack of any documentation, the failure to call a behavioral specialist, and the failure to report the injury to the parents," paired with "the complete lack of care exhibited on video by Defendants Peter and

Whittaker . . . support the conclusion that Student Doe was struck by [Peter and/or Whittaker] and the other Defendants are attempting to cover up this assault." (Id. ¶ 118).

On October 21, 2020, the Gandys filed suit against BOE Defendants, Whittaker, and Peter in the Circuit Court for Howard County, Maryland. (ECF No. 2). The action was removed to this Court on November 24, 2020. (ECF No. 1). On January 18, 2021, the Gandys filed an Amended Complaint. (ECF No. 16). The Gandys' sixteen-count Amended Complaint alleges claims for: negligence against all Defendants (Count I); negligent hiring, training, supervision, and retention against BOE Defendants and Peter (Count II); battery against Peter and Whittaker (Count III); intentional infliction of emotional distress against Peter and Whittaker (Count IV); violation of rights secured under Articles 24 and 26 of the Maryland Declaration of Rights against all Defendants (Counts V & VI); gross negligence against all Defendants (Count VII); violation of Maryland's public accommodation statute, Md. Code Ann., State Gov't § 20-901, against all Defendants (Count VIII); claims pursuant to 42 U.S.C. § 1983 for violation of rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution against all Defendants[3] (Counts IX & X); violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., against all Defendants (Count XII); violation of the Rehabilitation Act, 29 U.S.C. § 794 et seq., against all Defendants (Count XIII); retaliation in violation of the ADA and Rehabilitation Act against all Defendants (Count XIV & XV); and breach of fiduciary duty

---

[3] The Gandys also alleged a § 1983 claim for violation of the Eighth Amendment (Count XI). (Am. Compl. ¶¶ 238–48). However, the Gandys withdrew this claim through their Opposition to BOE Defendants' Motion. (Pls.' Resp. BOE Defs.' Mot. Dismiss Pls.' Am. Compl. at 34, ECF No. 27).

against all Defendants (Count XVI). (Am. Compl. ¶¶ 144–278). The Gandys seek compensatory and punitive damages. (Id. at 35).

BOE Defendants filed their Motion to Dismiss on February 19, 2021, (ECF No. 25); Whittaker filed her Motion to Dismiss Amended Complaint on February 25, 2021, (ECF No. 26); and Peter filed her Motion to Dismiss Amended Complaint on March 12, 2021, ECF No. 29). The Gandys filed their Oppositions on March 8, March 11, and March 29, 2021, respectively. (ECF Nos. 27, 28, 31). BOE Defendants filed a Reply on March 22, 2021. (ECF No. 30). To date, Peter and Whittaker have not filed Replies.

## II.    DISCUSSION

### A.    <u>Standard of Review</u>

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is

not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

**B.     Analysis**

**1.     Alternative Pleading**

At the outset, Defendants argue that the Amended Complaint should be dismissed in its entirety because the Gandys do not specifically allege who harmed Student Doe or how the harm arose. Defendants are correct that the Amended Complaint does not explain precisely what happened to Student Doe on the day of the incident. The Gandys, however, provide two justifications for this deficiency. First, the Gandys allege that Student Doe cannot explain what happened to him because his intellectual and behavioral disabilities render him non-verbal. (Am. Compl. ¶¶ 13, 111). Second, it is clear from the Amended Complaint that the Gandys lack information about what happened to Student Doe because

no one from Bellows Spring ever filled out a report concerning Student Doe's head injury, called the Gandys to notify them about the injury, or made any other attempt to inform the Gandys about the circumstances of the incident. (Id. ¶¶ 70, 87, 110, 112). As such, this is not a situation where a plaintiff attempts to rely on conclusory, unfounded assertions. Rather, this case presents a difficult situation where, through no fault of their own, the Gandys are forced to make deductions about the cause of Student Doe's injuries based on the limited information available to them.

As such, the Gandys allege that there are four possibilities for what happened to Student Doe: (1) he was intentionally or negligently struck by Peter and/or Whittaker; (2) he harmed himself by striking his head with his body or on an object; (3) he fell and struck his head; or (4) he was struck by another student. (Id. ¶ 111). Of these possibilities, the Gandys assert that the most likely scenario is that Student Doe was intentionally struck by Peter and/or Whittaker. (Id. ¶ 118). The Gandys reach this conclusion based upon the pediatrician's assessment of Student Doe's injuries, the lack of any suggestion that Student Doe had previously engaged in self-injurious behavior, the lack of evidence that Student Doe fell and hit his head or was struck by another student, and the fact that there were no reports that Peter and Whittaker called a behavioral specialist or used a restraint in the classroom. (See id. ¶¶ 102–18). The Gandys also state, however, that even the failure to adequately monitor Student Doe—thereby allowing him to engage in self-harm, fall, or be struck by another student—could also give rise to liability under the circumstances. (See id. ¶ 112).

11

The Gandys' approach is perfectly appropriate here. "[P]arties may plead alternative theories of liability, indeed as many theories as the facts will fit." U.S. for use & benefit of Tusco, Inc. v. Clark Constr. Grp., LLC, 235 F.Supp.3d 745, 755 (D.Md. 2016) (quoting Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc., 190 F.Supp.2d 785, 792 (D.Md. 2002)). Further, at the pleading stage, a plaintiff is required to allege only "'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' of the alleged activity" of the defendant. U.S. Airline Pilots Ass'n v. Awappa, LLC, 615 F.3d 312, 317 (4th Cir. 2010) (quoting Twombly, 550 U.S. at 555). The Gandys have proffered four plausible theories of the cause of Student Doe's injuries and raised a reasonable expectation that discovery will reveal one to be the true cause. Accordingly, the Gandys have satisfied their burden at this stage.

## 2.   State Law Claims

### a.   Negligence Claims

The Gandys assert claims for negligence and gross negligence against all Defendants (Counts I and VII), as well as claims for negligent hiring, training, supervision, and retention against Peter and BOE Defendants (Count II).[4]

---

[4] In addition to their negligence claims, the Gandys also assert a claim for breach of fiduciary duty against all Defendants (Count XVI). To establish a breach of fiduciary duty as an independent cause of action in Maryland, a plaintiff must demonstrate: "(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary." Plank v. Cherneski, 231 A.3d 436, 466 (Md. 2020) (quoting Froelich v. Erickson, 96 F.Supp.2d 507, 526 (D.Md. 2000)). In general, a fiduciary relationship may exist between parties "by common law, by statute, or by contract." Id. at 465. The elements of a breach of fiduciary duty claim mirror the elements of a negligence claim; therefore, the Court need not analyze them separately. Because the

A properly pleaded claim of negligence includes four elements: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the defendant's breach of the duty proximately caused the loss or injury suffered by the plaintiff, and (4) that the plaintiff suffered actual loss or injury." Troxel v. Iguana Cantina, LLC, 29 A.3d 1038, 1049 (Md.Ct.Spec.App. 2011) (citing Corinaldi v. Columbia Courtyard, Inc., 873 A.2d 483, 489 (Md.Ct.Spec.App. 2005)). In Maryland, "[t]he tort of negligent selection, training, or retention, like any negligence action, requires the plaintiff to prove the existence of [the same] four elements." Jones v. Family Health Ctrs. of Balt., Inc., 135 F.Supp.3d 372, 381 (D.Md. 2015) (quoting Jones v. State, 38 A.3d 333, 343 (Md.Ct.Spec.App. 2012)). Likewise, "the elements of negligent supervision are identical to the elements of a general negligence claim." Marrick Homes LLC v. Rutkowski, 161 A.3d 53, 65 (Md.Ct.Spec.App. 2017) (citing Fid. First Home Mortg. Co. v. Williams, 56 A.3d 501, 511 (Md.Ct.Spec.App. 2012)).

As for a claim for gross negligence, a plaintiff must allege "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another," which "implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." Cooper v. Rodriguez, 118 A.3d 829, 832–33 (Md. 2015) (quoting Barbre v. Pope, 935 A.2d 699, 717 (Md. 2007)).

---

Court finds that the Gandys have adequately stated their negligence claims, the Court will also permit the Gandys' breach of fiduciary duty claim to proceed.

### i.  Peter and Whittaker

Peter and Whittaker argue that the Gandys fail to state their claims for negligence and gross negligence because the Amended Complaint does not adequately set forth a breach of duty, proximate cause, or conduct that rises to the level of gross negligence. The Court disagrees. First, it is well established that Peter and Whittaker had a duty to keep Student Doe safe while he was in their custody and control pursuant to the in loco parentis doctrine, which provides that "school authorities have a common law duty, 'as the temporary custodians of children, to exercise reasonable care for their protection.'" Loveless v. Estevez, No. 01985, Sept. Term 2017, 2019 WL 4187465, at *6 (Md.Ct.Spec.App. Sept. 3, 2019) (quoting Collins v. Bd. of Educ. of Kent Cnty., 426 A.2d 10, 13 (Md.Ct.Spec.App. 1981)). The Gandys allege that Peter and Whittaker breached this duty by intentionally striking Student Doe or, alternatively, by failing to adequately supervise him in the classroom. The Amended Complaint also gives rise to a reasonable inference of causation because the Gandys state that Student Doe's injury occurred while he was present in the classroom with Peter and Whittaker. Further, because the Gandys allege that Peter and Whittaker were aware of the need to closely supervise Student Doe, the Amended Complaint also adequately establishes that Peter and Whittaker exhibited a reckless disregard for the consequences of their actions. At this stage, these allegations are sufficient to state a claim for negligence and gross negligence against Peter and Whittaker.

By contrast, the Gandys' claims for negligent hiring, training, supervision, and retention against Peter are insufficient. The Gandys do not allege that Peter was responsible for hiring, training, or monitoring the continued employment of Whittaker, nor do they

state that Peter was responsible for supervising Whittaker while they were in the classroom. To the extent the Gandys allege that Peter was responsible for supervising Student Doe and his classmates, these allegations merge with the Gandys' general negligence and gross negligence claims against Peter. For these reasons, the Gandys' claim for negligent hiring, training, supervision, and retention will be dismissed as to Defendant Peter.

### ii.     Principal Hahn

As for their negligence claims against Defendant Hahn, the Gandys assert that Hahn breached her duty to Student Doe by hiring Peter as a special education instructor even though she had no experience teaching students with autism, was not trained to implement the Primary Leaner program, and had "admitted to Principal Hahn that she was not excited about her job because of her concerns regarding student safety and the lack of her training, education, and experience." (Am. Compl. ¶¶ 24–26, 29, 39). Additionally, the Gandys state that Hahn permitted Peter and Whittaker to supervise Student Doe's classroom despite knowing "that inexperienced, untrained, and uneducated teachers, paraeducators, and staff could injure special needs children by acting or failing to act in accordance with established rules, regulations, and guidelines." (Id. ¶ 31). The Gandys also allege that Hahn was specifically aware of these risks because they wrote to her at the start of the 2018–19 school year to express their concerns about Peter's ability to care for Student Doe and to keep him safe. (Id. ¶¶ 47–49). Taken together, these allegations are sufficient to support the Gandys' negligence claims against Hahn.

For her part, Hahn contends that the Gandys' negligence claims fail as a matter of law because they amount to nothing more than claims for "educational malpractice." The

Court is not persuaded. The Maryland Court of Appeals discussed "educational malpractice" claims in Hunter v. Board of Education of Montgomery County, 439 A.2d 582 (Md. 1982). There, the parents of a public-school student sued the school system for "negligently evaluat[ing] the child's learning abilities" and forcing "him to repeat first grade materials while being physically placed in the second grade," which caused him to feel "embarrassment" and develop "learning deficiencies." Id. at 583. The court dismissed the parents' challenge, reasoning that negligence claims were unworkable in the context of "asserted errors in the educational process" due to concerns about establishing legal cause and "the inherent immeasurability of damages." Id. at 585. The court also noted that, as a general matter, decisions about assessment and placement of students were best left to school administrators, not the courts. See id. at 586.

Here, the Gandys do not challenge Student Doe's placement in special education classes, but rather take issue with the adequacy of Student Doe's care while he was present in the classroom. Unlike the parents in Hunter, the Gandys do not assert that Defendants' placement decisions caused Student Doe to fall behind in school or suffer embarrassment. Instead, the Gandys assert that Student Doe's teachers were unfamiliar with the unique behavioral needs of special education students, which increased the chance that Student Doe would suffer physical harm. In all, because the Gandys' negligence claim goes beyond a mere disagreement with the pedagogical choices of school administrators, it is not an impermissible educational malpractice claim. Accordingly, the Court will permit the Gandys' negligence claims to proceed against Defendant Hahn.

### iii.    BOE

BOE argues that the Gandys' negligence claims fail as a matter of law because they seek to hold BOE liable for malicious acts by Peter and Whittaker, which clearly fall outside the scope of their employment. For the reasons explained below, the Court disagrees.

The procedure for asserting a tort claim against a county school board and its employees is governed by § 5-518 of the Courts and Judicial Proceedings Article of the Maryland Annotated Code. Under the statute, "a county board employee acting within the scope of employment, without malice and gross negligence, is not personally liable for damages resulting from a tortious act or omission." Md. Code Ann., Cts. & Jud. Proc. ["CJ"] § 5-518(e). As such, a tort action against a county board employee proceeds as follows: "(1) a suit may be brought directly against a board employee; (2) 'a county board of education <u>must</u> be joined as a party to an action against a county board employee who has committed a tortious act or omission within the scope of his or her employment'; (3) '[a] judgment may then be entered against both the employee and the county board of education'; but (4) the judgment may only be levied and executed against the board." <u>Neal v. Balt. City Bd. of Sch. Comm'rs</u>, 225 A.3d 66, 76 (Md. 2020) (quoting <u>Bd. of Educ. of Prince George's Cnty. v. Marks-Sloan</u>, 50 A.3d 1137, 1153 (Md. 2012)).

The question of whether an employee was acting within the scope of employment may be litigated separately. CJ § 5-518(d)(2). Additionally, a finding that an employee of a county school board acted with malice or gross negligence does not absolve the school board of liability. Rather, § 5-518 "contemplates the scenario where a board employee acts

within the scope of employment <u>and</u> with malice or gross negligence." <u>Neal</u>, 225 A.3d at 79. In other words, "it is feasible that an employee, acting maliciously in the scope of their employment, may be concurrently liable with the board under § 5-518," in which case "a judgment could then be levied and executed against both the employee and the board." <u>Id.</u>

Here, the Gandys allege that Peter and Whittaker could have injured Student Doe while attempting to restrain him. (<u>See</u> Am. Compl. ¶¶ 114–16). The Gandys explain that there are guidelines for restraining special needs children and that a restraint performed within those guidelines should not result in any injury to the child. (<u>Id.</u> ¶¶ 31, 115). Thus, if Peter and Whittaker attempted to restrain Student Doe but did so in a manner that caused him to suffer a concussion, it is plausible that Peter and Whittaker acted within the scope of their employment <u>and</u> with malice or gross negligence. In this instance, BOE would be liable for Peter and Whittaker's conduct even if it was the result of malice or gross negligence. Alternatively, BOE may also be liable for Peter and Whittaker's actions if they injured Student Doe by failing to properly supervise him in the classroom. Under either set of facts, BOE must be joined as a defendant. <u>See</u> CJ § 5-518(d)(1) ("The county board shall be joined as a party to an action against a county board employee . . . that alleges damages resulting from a tortious act or omission committed by the employee in the scope of employment . . . ."). Accordingly, the Gandys' negligence claims against BOE may proceed at this stage.

Separately, BOE contends that the Gandys' claims for negligent hiring, training, supervision, and retention are improper because they "are premised on educational based decision-making that is entwined in the educational process and academic environment."

(Mem. Supp. Mot. Dismiss Pls.' Am. Compl. at 13 ["BOE Defs.' Mot."], ECF No. 25). In support of this argument, BOE points to Gurbani v. Johns Hopkins Health Systems Corp., 185 A.3d 760 (Md.Ct.Spec.App. 2018), in which the plaintiff, a medical student, brought negligence claims against her clinical instructors and medical school after the instructors gave her negative evaluations and dismissed her from the school's residency program. Id. at 782. The Maryland Court of Special Appeals dismissed the plaintiff's claims as improper "educational malpractice" claims, finding that the instructors' recommendations were purely "academic decision[s]" that were "the result of a careful and deliberate exercise of professional judgment" and that the school had no duty to intervene in such decisions. Id. at 781, 787.

The Gandys' claims here are distinguishable from those in Gurbani. Unlike the plaintiff in Gurbani, who challenged her instructors' professional assessment of her clinical performance, the claims here are focused on BOE's ultimate duty to ensure that its teachers are qualified to provide adequate care for special needs students for the purpose of keeping them safe. As explained in the Amended Complaint, special needs students have unique behavioral and emotional needs that require educators to implement certain educational and disciplinary techniques and, at the very minimum, closely monitor the students. As a result, assigning inexperienced and untrained teachers to a special education classroom greatly increases the likelihood that the students might suffer physical harm. The Gandys assert that BOE had a duty to hire, train, and supervise the special needs educators at Bellows Spring to ensure that they were well-equipped to care for the safety of Student Doe and his classmates, and that BOE breached this duty by employing Peter and

Whittaker. Thus, this is not a situation in which a plaintiff seeks to have the court improperly second-guess the academic decisions or professional judgments of school administrators. For this reason, the Gandys' negligence claims are not educational malpractice claims, and the claims may proceed against BOE.

### b.    Battery

The Gandys bring a claim for battery against Defendants Peter and Whittaker (Count III). Battery "is the unlawful application of force to the person of another." Snowden v. State, 583 A.2d 1056, 1059 (Md. 1991). To plead a successful claim for battery, a plaintiff must allege specific facts showing that the defendant intended to make a harmful or offensive contact without that person's consent. See Northfield Ins. Co. v. Boxley, 215 F.Supp.2d 656, 661 (D.Md. 2002) (citing Nelson v. Carroll, 735 A.2d 1096, 1100 (Md. 1999)).

Peter and Whittaker contend that the Gandys' battery claim must be dismissed because it is purely speculative. While it is true that the Gandys cannot state for certain that Peter or Whittaker intentionally struck Student Doe, the allegations in the Amended Complaint nonetheless give rise to a reasonable inference that Peter and/or Whittaker are liable for the conduct alleged. The Gandys allege that Student Doe came home from school with unexplained injuries on multiple occasions in the weeks leading up to the September 17, 2018 incident, while he was under the care and supervision of Peter and Whittaker. (Am. Compl. ¶¶ 52, 54). The school nurse was called to Student Doe's classroom on the day of the incident, but neither Peter nor Whittaker prepared an incident report or made any attempt to contact the Gandys about their son's injury. (Id. ¶¶ 68–70). Further, Student

Doe suffered from severe swelling and a concussion, which Student Doe's pediatrician concluded could not be the result of self-injury, a fall, or an assault from another student. (Id. ¶¶ 86, 90–92, 102–03). Taken together, these allegations are sufficient to plausibly allege that Peter and/or Whittaker intentionally and unlawfully applied force against Student Doe. Accordingly, the Gandys' battery claim survives.

### c.   Intentional Infliction of Emotional Distress

Next, the Gandys assert a claim for intentional infliction of emotional distress ("IIED") against Defendants Peter and Whittaker (Count IV). To plead an IIED claim under Maryland law, a plaintiff must allege sufficient facts in support of four elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; (4) The emotional distress must be severe." Takacs v. Fiore, 473 F.Supp.2d 647, 651–52 (D.Md. 2007) (quoting Harris v. Jones, 380 A.2d 611, 614 (Md. 1977)). Put differently, to state a claim for IIED, it must appear that the defendant's conduct is "beyond all possible bounds of decency, . . . atrocious, and utterly intolerable in a civilized community." Borchers v. Hyrchuc, 727 A.2d 388, 392 (Md.Ct.Spec.App. 1999) (quoting Cont'l Cas. Co. v. Mirabile, 449 A.2d 1176, 1186 (Md.Ct.Spec.App. 1982)). The tort of IIED "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." Ky. Fried Chicken Nat'l Mgmt. Co. v. Weathersby, 607 A.2d 8, 9 (Md. 1997). At the same time, "the extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person which gives

21

him actual or apparent authority over him, or power to affect his interests." <u>Borchers</u>, 727
A.2d at 392 (quoting <u>Harris</u>, 380 A.2d at 616).

Although the standard for an IIED claim is high, the Court finds that the Gandys
have satisfied that burden here. According to the Gandys, Peter and/or Whittaker
intentionally struck a six-year-old, non-verbal autistic child in the head with such force that
he suffered a concussion and significant bruising and swelling on his forehead, eyes, and
face. Student Doe's forehead became red and swollen almost immediately, and his injury
was apparently serious enough for Peter and Whittaker to call the school nurse to the
classroom, yet Peter and Whittaker made no attempt to contact Student Doe's parents or
formally document the incident as required by school policy. Peter and Whittaker took
additional steps to ignore or otherwise avoid blame for Student Doe's injuries—Whittaker
exhibited indifference to Student Doe immediately after the incident by "turn[ing] her
back" to him and "hurriedly drag[ging]" him to the bus despite his obvious injuries and
distress, (Am. Compl. ¶¶ 76–77), and Peter later tried to cast blame elsewhere by asserting
that Student Doe had been agitated from the time he got off the bus that day, (<u>id.</u> ¶ 119). In
addition, Peter and Whittaker are special education teachers who are trusted with protecting
vulnerable children with special needs. If ultimately proven to be true, Peter and
Whittaker's actions here would certainly amount to conduct that is outside all possible
bounds of decency. As such, these allegations are sufficient to allege that Peter and/or
Whittaker engaged in conduct that was intentional, extreme, and outrageous.

Peter and Whittaker argue that Student Doe's emotional distress is not sufficiently
severe to state a claim for IIED. The Court disagrees. Severe emotional distress is defined

as "a severely disabling emotional response to the defendant's conduct." Harris, 380 A.2d at 616. According to the Gandys, Student Doe started to suffer from nightmares and separation anxiety after the incident and he cries every time he is driven by the school. The Gandys have since enrolled Student Doe in behavioral therapy to treat the psychological, emotional, and mental distress resulting from his injury. In light of these allegations, the Gandys have plainly alleged that Peter and Whittaker's conduct caused Student Doe to suffer a severely disabling emotional response. Student Doe's emotional distress is therefore sufficiently severe to state a claim for IIED. Accordingly, the Court will deny Peter and Whittaker's motions to dismiss the Gandys' IIED claims.

### d.    Public Accommodation Statute

The Gandys bring Count VIII of their Amended Complaint pursuant to the State Government Article of the Maryland Annotated Code, which provides that "an owner or operator of a place of public accommodation . . . may not refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities, or privileges of the place of public accommodation because of the person's . . . disability." Md. Code Ann., State Gov't ("SG") § 20-304. The Gandys contend that this statute applies to Defendants because each is "a unit, officer, or employee of the State, a county, or a municipal corporation." SG § 20-901.

This claim must be dismissed for two reasons. First, "a place of public accommodation" is statutorily defined as:

> (1)    an inn, hotel, motel, or other establishment that provides lodging to transient guests;

23

     (2)     a restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food or alcoholic beverages for consumption on or off the premises, including a facility located on the premises of a retail establishment or gasoline station;

     (3)     a motion picture house, theater, concert hall, sports arena, stadium, or other place of exhibition or entertainment;

     (4)     a retail establishment that:
          (i)     is operated by a public or private entity; and
          (ii)     offers goods, services, entertainment, recreation, or transportation; or

     (5)     an establishment:
          (i)     1.     that is physically located within the premises of any other establishment covered by this subtitle; or
               2.     within the premises of which any other establishment covered by this subtitle is physically located; and
          (ii) that holds itself out as serving patrons of the covered establishment.

SG § 20-301. The Gandys do not cite, and the Court is not aware of, any cases suggesting that a Maryland public school falls into one of these categories. Moreover, the Court is not persuaded by the Gandys' argument that a school could be considered a place of public accommodation merely because it has a cafeteria or lunchroom and may have a theatre, concert hall, stadium, art gallery or offer some retail items, entertainment, or transportation for the students. Because Bellows Spring is not a place of public accommodation as defined by the statute, the Gandys' claim cannot survive.

     Second, even if Bellows Spring were a place of public accommodation, the Gandys' claim would nonetheless fail because Maryland's anti-discrimination statute does not give rise to a private right of action. Indeed, this Court has previously held that while a person

subject to discrimination in public accommodations may file a complaint with the Maryland Commission on Civil Rights, the Maryland anti-discrimination statute does not authorize a private individual to file a civil action in court. See <u>M.R. by & Through N.R. v. Tajdar</u>, No. TDC-17-3836, 2018 WL 6050888, at *5–6 (D.Md. Nov. 19, 2018). For these reasons, Count VIII must be dismissed.

### 3.    Constitutional Claims

The Gandys assert claims against Defendants pursuant to 42 U.S.C. § 1983 for violation of Student Doe's rights guaranteed by the Fourth and Fourteenth Amendments of the U.S. Constitution (Counts IX and X) and Articles 24 and 26 of the Maryland Declaration of Rights (Counts V and VI).[5] "Articles 24 and 26 of Maryland Declaration of Rights are the state constitutional counterparts to the Fourteenth and Fourth Amendments, respectively." <u>Meyers v. Balt. Cnty.</u>, 981 F.Supp.2d 422, 430 (D.Md. 2013) (citations omitted). These state provisions are interpreted in light of their federal analogs, meaning a given constitutional claim is analyzed the same whether it is brought under an Article of the Maryland Constitution or an Amendment to the U.S. Constitution. <u>Henry v. Purnell</u>, 501 F.3d 374, 382 n.10 (4th Cir. 2007) (holding that an excessive force claim is analyzed the same whether it is brought under the Fourth Amendment or Article 26 of the Maryland

---

[5] The Gandys style Count X of the Amended Complaint as a claim for violation of Student Doe's Fifth and Fourteenth Amendment rights. "Due process claims under the Fifth Amendment apply to federal actors, whereas due process claims under the Fourteenth Amendment apply to state actors." <u>White v. City of Greensboro</u>, 408 F.Supp.3d 677, 691 (M.D.N.C. 2019) (citing <u>United States v. Al-Hamdi</u>, 356 F.3d 564, 573 n.11 (4th Cir. 2004)). Importantly, however, "[t]he standard of review for the two types of due process challenges does not differ." <u>Id.</u> The Court therefore construes the Gandys' Fifth Amendment claim as a claim under the Fourteenth Amendment's due process clause.

Constitution). Accordingly, the Court will analyze the Gandys' federal constitutional claims together with their claims under the Maryland Declaration of Rights.

### a.      Peter and Whittaker

The Gandys allege that Defendants Peter and/or Whittaker used excessive force against Student Doe in violation of his Fourth Amendment rights by intentionally striking him in the head. "The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of 'seizures effectuated by excessive force.'" Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (quoting Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006)). In the context of schools, use of force against students must be "reasonably related in scope to the circumstances which justified [it] in the first place." Wofford v. Evans, 390 F.3d 318, 326 (4th Cir. 2004) (discussing seizure of students in the context of Fourth Amendment claims) (quoting New Jersey v. T.L.O., 469 U.S. 325, 341 (1985)). Here, although the Gandys do not allege precisely how Peter and/or Whittaker injured Student Doe, they state that their use of force against him resulted in visible swelling and a diagnosed concussion. Drawing all factual inferences in the Gandys' favor, these allegations plausibly suggest that Peter and/or Whittaker's use of force against Student Doe—a six-year-old special education student—exceeded its reasonable scope. Accordingly, the Court declines to dismiss the Gandys' excessive force claim against Peter and Whittaker.

The Gandys also allege in the alternative that Student Doe's injuries resulted from improper restraint by Defendants Peter and/or Whittaker in violation of Student Doe's Fourteenth Amendment rights. (See Am. Compl. ¶¶ 114–16). Liberty from bodily restraint

lies at the core of the liberty protected by the Due Process Clause of the Fourteenth Amendment. H.H. ex rel. H.F. v. Moffett, 335 F.App'x 306, 313 (4th Cir. 2009) (citing Youngberg v. Romeo, 457 U.S. 307, 316 (1982)). "Because restraint cases require [the Court] to balance an individual's liberty interest against a state interest in using the restraint, '[t]he question . . . is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint . . . is such as to violate due process.'" Id. (quoting Youngberg, 457 U.S. at 320). A violation of an individual's substantive due process rights will typically arise where the use of a restraint is "so inspired by malice . . . that it amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience." Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980) (citation omitted).

Here, the Gandys allege that Peter and/or Whittaker's restraint of Student Doe was unjustified because Student Doe's IEP and BIP did not call for restraint and, prior to the incident, there was no evidence that a restraint would have been necessary to prevent possible self-harm by Student Doe. (See Am. Compl. ¶¶ 107–08). The Gandys also state that, even if a restraint had been necessary, a restraint performed in accordance with established techniques would not have resulted in any injury to Student Doe's head. (Id. ¶ 115). Further, the allegations that Peter and Whittaker failed to seek formal medical attention for Student Doe, neglected to follow the procedures for documenting Student Doe's injury, and seemed indifferent or even evasive about Student Doe's injury after the incident each support an inference that Peter and Whittaker acted with malice. Once again, while the Gandys do not explain precisely how Peter and/or Whittaker restrained Student

Doe, the allegations in the Amended Complaint are sufficient to plausibly allege that the extent or nature of the restraint infringed on Student Doe's Fourteenth Amendment rights. Accordingly, the Gandys have adequately stated a due process claim against Peter and Whittaker.

In response, Defendants Peter and Whittaker assert that the Gandys' § 1983 claims against them should be dismissed because they are entitled to qualified immunity. Qualified immunity "protect[s] government officials performing discretionary functions from civil damage suits 'insofar as [the officials'] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" McVey v. Stacy, 157 F.3d 271, 276 (4th Cir. 1998) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In determining whether a defendant is entitled to qualified immunity, a court must decide (1) whether the defendant has violated a constitutional right of the plaintiff and (2) whether that right was clearly established at the time of the alleged misconduct. See Walker v. Prince George's Cnty., 575 F.3d 426, 429 (4th Cir. 2009). Despite this clear standard, Peter and Whittaker make no argument that Student Doe's right to be free from excessive force or unlawful restraint was not clearly established at the time of his injury. As a result, Peter and Whittaker are not entitled to qualified immunity at this stage, and the Gandys' constitutional claims may proceed against them.

### b.      Principal Hahn

The Gandys assert their constitutional tort claims against Defendant Hahn in her supervisory capacity as school principal. As a general matter, § 1983 requires a showing of personal fault based upon a defendant's personal conduct. See Vinnedge v. Gibbs, 550

28

F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no <u>respondeat superior</u> liability under § 1983. <u>Iqbal</u>, 556 U.S. at 676; <u>see also</u> <u>Wilcox v. Brown</u>, 877 F.3d 161, 170 (4th Cir. 2017). Still, "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." <u>Shaw v. Stroud</u>, 13 F.3d 791, 798 (4th Cir. 1994). In such cases, liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" <u>Baynard v. Malone</u>, 268 F.3d 228, 235 (4th Cir. 2001) (quoting <u>Slakan v. Porter</u>, 737 F.2d 368, 372 (4th Cir. 1984)). Thus, with respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

<u>Shaw</u>, 13 F.3d at 799 (internal quotation marks and citations omitted).

Applying these elements here, the Court finds that the Gandys have not adequately pleaded a claim for supervisory liability against Hahn. First, although the Gandys allege that they informed Hahn about their concerns with Peter's ability to safely manage the classroom, this does not suggest that Hahn was aware of a pervasive and unreasonable risk

29

of constitutional injury to Student Doe. Additionally, the Amended Complaint is devoid of any allegations suggesting that Hahn's response to the Gandys' concerns rose to the level of deliberate indifference or that Hahn's failure to act was affirmatively linked to Student Doe's injury. For these reasons, the Gandys' constitutional claims against Hahn must be dismissed.

### c.   BOE

The Gandys' also bring their constitutional tort claims against BOE. As discussed above, the Maryland General Assembly has provided a limited waiver of a county school board's sovereign immunity for tortious acts and omissions committed by the board's employees in the scope of their employment. See Neal, 225 A.3d at 69–70. In such cases, the school board must be joined as a defendant. See CJP § 5-518(d)(1). Thus, because the Gandys have adequately stated constitutional tort claims against Defendants Peter and Whittaker, BOE may not be dismissed from suit.

However, to the extent that the Gandys bring their constitutional tort claims against BOE directly, these claims must be dismissed. First, as to the Gandys' Fourth and Fourteenth Amendment claims, it is well established in Maryland that county school boards as not considered "persons" under § 1983 and therefore cannot be subject to liability under the statute. See Schiffbauer v. Schmidt, 95 F.Supp.3d 846, 852 (D.Md. 2015) (dismissing § 1983 claims against school board despite limited waiver of sovereign immunity under CJP § 5-518).

Likewise, to the extent the Gandys attempt to proceed on a claim against BOE for a "pattern or practice" of violating the Maryland Declaration of Rights, this claim also fails.

Although the Maryland Court of Appeals held in <u>Prince George's County v. Longtin</u>, 19 A.3d 859 (Md. 2011), that plaintiffs may bring a "pattern or practice" claim against a <u>local government</u> for unconstitutional policies, "the <u>Longtin</u> court neither stated nor intimated that plaintiffs could institute pattern or practice claims against <u>state government agencies</u>." <u>Rosa v. Bd. of Educ. of Charles Cnty.</u>, No. AW-11-2873, 2012 WL 3715331, at *10 (D.Md. Aug. 27, 2012) (emphasis added) (citing <u>Longtin</u>, 19 A.3d at 883–89). Thus, while BOE may ultimately be liable to the Gandys for the constitutional torts of Peter and Whittaker, the Gandys cannot bring state or federal constitutional claims against BOE directly.

### 4.  ADA and Rehabilitation Act

Finally, the Gandys assert claims for discrimination and retaliation under the ADA and the Rehabilitation Act against BOE (Counts XII–XV).[6] The Court addresses these claims in turn.

### a.  Discrimination

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or

---

[6] Although the Gandys' also bring their ADA and Rehabilitation Act claims against Hahn, Peter, and Whittaker, the claims must be dismissed as to these Defendants because neither statute permits an action against individuals. <u>Z.G. by & through C.G. v. Pamlico Cnty. Pub. Sch. Bd. of Educ.</u>, 744 F. App'x 769, 781 n.20 (4th Cir. 2018).

his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Although there is a difference in the causation language used in these statutes, the elements are effectively the same: "[I]n the context of a student excluded from an educational program, to prove a violation of either [the ADA or § 504], the plaintiff must establish that (1) he has a disability, (2) he is otherwise qualified to participate in the defendant's program, and (3) he was excluded from the program on the basis of his disability." Halpern v. Wake Forest Univ. Health Scis., 669 F.3d 454, 461 (4th Cir. 2012) (footnote omitted).

Here, the Gandys plainly allege that Student Doe suffers from a disability and that he was qualified to be a part of the special education program at Bellows Spring. BOE contends, however, that the Amended Complaint fails to identify any discriminatory acts taken against Student Doe on account of his disability. The Court disagrees. The Gandys allege that Hahn and BOE discriminated against Student Doe by hiring a teacher and aide who lacked experience and training in the method of instruction for special education students. Further, the Gandys assert that Peter and Whittaker discriminated against Student Doe by intentionally harming him or, alternatively, neglecting to closely supervise him consistent with the requirements of his IEP and BIP. The Gandys thus contend that Student Doe was excluded from education at Bellows Spring and forced to enroll in a private school program because Defendants refused to accommodate his disability. At this early stage of the proceedings, these allegations are sufficient to state a discrimination claim under the

ADA and Rehabilitation Act. Accordingly, BOE's request to dismiss these claims will be denied.

### b.     Retaliation

To succeed on a retaliation claim under the ADA or Rehabilitation Act, the plaintiff must ultimately prove that: "(1) he engaged in protected conduct; (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." Schmidt v. Town of Cheverly, 212 F.Supp.3d 573, 580 (D.Md. 2016) (quoting Reynolds v. Am. Nat. Red Cross, 701 F.3d 143, 154 (4th Cir. 2012)).

BOE argues that the Gandys did not engage in any protected activity because their complaints to the school did not specifically indicate that they were challenging BOE's non-compliance with the ADA or Rehabilitation Act. This argument fails. The retaliation provision of the ADA, which is incorporated into the Rehabilitation Act, prohibits retaliation against any person who "made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing" or "opposed any act or practice made unlawful by [the ADA]." Reynolds, 701 F.3d at 154 (quoting 42 U.S.C. § 12203(a)). Importantly, a plaintiff is not required to prove the conduct he opposed was actually a violation of the ADA, but instead must show he had a "good faith belief" that the conduct violated the statutes. Id. (quoting Freilich v. Upper Chesapeake Health, 313 F.3d 205, 216 (4th Cir. 2002)). Here, the Gandys' repeated complaints that Student Doe's instructors were non-compliant with his IEP and BIP are fairly construed as requests for accommodation. A request for accommodation is a protected activity under the ADA. Sillah v. Burwell, 244 F.Supp.3d 499, 513 (D.Md. 2017) (citing Haulbrook v. Michelin N. Am., 252 F.3d 696,

706 (4th Cir. 2001)). As such, the Court finds that the Gandys have adequately alleged that they engaged in protected conduct and will not dismiss their retaliation claims on that basis.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the Motions to Dismiss by BOE Defendants, Whittaker, and Peter (ECF Nos. 25, 26, 29). A separate Order follows.

Entered this 1st day of September, 2021.

_____/s/_____
George L. Russell, III
United States District Judge
